UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X
KHURRAM SHAHZAD,

        Plaintiff,

    -against-

THE COUNTY OF NASSAU, NASSAU
COUNTY POLICE DEPARTMENT,
SERGEANT DAVID VEVERKA,
*Shield # 1495*, POLICE OFFICER DAVID
TAIT, *Shield # 01471*, SERGEANT BURTON
A. FRIED, DETECTIVE THOMAS STORZ,
DETECTIVE JASON PINSKY, *Shield # 7908*
*of the Forensic Evidence Bureau*, KATHLEEN
RICE, *Nassau County District Attorney*,
PATRICK J. FINLEY, *Assistant District*
*Attorney*, COMMISSIONER FORD,
CORPORAL HARDY, CORRECTION
OFFICER DALEY, OFFICERS OF THE
NASSAU COUNTY SHERIFFS
DEPARTMENT CORRECTIONS DIVISION,

        Defendants.
---------------------------------------------------------X

**MEMORANDUM &**
**ORDER**
13-CV-2268 (JMA) (SIL)

APPEARANCES:

    Andrew C. Laufer
    Law Office of Andrew C. Laufer, PLLC
    255 West 36th Street, Suite 1104
    New York, NY 10018
        *Attorney for Plaintiff*

    Thomas Lai
    Nassau County Attorney Office
    1 West Street
    Mineola, NY 11501
        *Attorney for Defendants*

**AZRACK, United States District Judge:**

    Plaintiff Khurram Shahzad brings this suit alleging that defendants violated 42 U.S.C.

§ 1983 ("Section 1983") and state law during plaintiff's prosecution and incarceration. Currently

pending before the Court is defendants' motion for summary judgment on all of plaintiff's claims.

In June 2007, plaintiff was arrested on various charges, including possession of cocaine, marijuana and oxycodone, and driving with a suspended license. In September 2010, he was convicted on these charges and sentenced to two years in prison. A few days after his sentencing, problems with the Nassau County Forensic Evidence Bureau ("FEB") became public, which resulted in the closing of the lab in February 2011. Based on these revelations about the FEB, plaintiff filed a motion in state court to vacate his conviction. After the state court ordered an evidentiary hearing on plaintiff's motion, plaintiff and the prosecution agreed to vacate plaintiff's convictions, and plaintiff pled guilty to driving with a suspended license. In the instant suit, plaintiff brings claims under Section 1983 for violations of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), based on the prosecution's failure to disclose evidence about the problems at the FEB, malicious prosecution, fabrication of evidence, and conspiracy concerning his arrest, prosecution, and conviction. Plaintiff also alleges that, during his incarceration, he was subjected to excessive force by corrections officers and deprived of appropriate meals in violation of the Eighth Amendment.

In addition to Nassau County, numerous individuals have also been named as defendants. Defendants David Veverka, David Tait, Thomas Storz, and Burton Fried are police officers who were either involved in plaintiff's arrest or handled the drugs allegedly seized from plaintiff. Defendant Jason Pinsky is a police officer who was employed as a detective in the FEB. Pinsky tested the drugs allegedly seized from plaintiff and testified at plaintiff's criminal trial. Defendant Kathleen Rice was the Nassau County District Attorney at the time of plaintiff's prosecution. Assistant District Attorney Patrick Finely worked on the District Attorney's

opposition to plaintiff's motion to vacate his conviction. Defendants James Ford, Charles Daley, and Robert Hardy were corrections officers at the Nassau County jail during plaintiff's incarceration and are allegedly liable for excessive force and denying plaintiff appropriate meals.

Defendants have moved for summary judgment on all of plaintiff's claims. The Court grants defendants summary judgment on all of plaintiff's federal claims concerning his prosecution, his state law malicious prosecution claim, and his Eighth Amendment meals claim. The Court denies summary judgment on plaintiff's excessive force claims.

## I. BACKGROUND

### A. <u>**Overview and Procedural History**</u>

On June 8, 2007, Officers Veverka and Tait arrested plaintiff in a Dunkin Donuts parking lot on Merrick Road in Massapequa, New York. (Pl.'s 56.1 ¶¶ 88, 94.) According to the officers, they stopped plaintiff's car after they observed plaintiff drive through a red light. (<u>Id.</u> ¶ 92.) The officers maintain that, during the stop, they discovered cocaine and marijuana in the car as well as various prescription pills on plaintiff's person. (<u>Id.</u> ¶¶ 99, 101, 105.). According to the officers, they sent these drugs to the FEB for testing. (<u>Id.</u> ¶ 107.)

On January 22, 2008, plaintiff was indicted for: (1) Criminal Possession of a Controlled Substance in the Fourth Degree; (2) two counts of Criminal Possession of a Controlled Substance in the Seventh Degree; (3) Unlawful Possession of Marijuana; (4) Aggravated Unlicensed Operation of a Motor Vehicle in the Third Degree; (5) Aggravated Unlicensed Operation of a Motor Vehicle in the Second Degree; (6) Unlicensed Operator; (7) Failing to Stop at a Red Light; and (8) Criminal Impersonation in the Second Degree. (<u>Id.</u> ¶ 115.)

On April 22, 2008, Supreme Court, Nassau County, dismissed the indictment against plaintiff. (Pl.'s Ex. Z.) In May 2008, the prosecution appealed the dismissal. (<u>Id.</u>) Until the

indictment was dismissed in April 2008, plaintiff was incarcerated at the Nassau County Correctional Center. (Defs.' Ex. R ¶ 13.) In March 2010, the Appellate Division reversed the trial court's dismissal of the indictment. (Pl.'s Ex. Y.)

In September 2010, plaintiff was convicted on all counts by a jury after a five-day trial and was sentenced to two years in prison. (Compl. ¶ 116; Criminal Trial Tr. ("Tr.), Defs.' Ex. LL; Compl. ¶ 56.) In December 2010, a week after plaintiff was sentenced, problems at the FEB became public.

In September 2011, plaintiff moved in state court to vacate his conviction based on the problems at the FEB, which had not been disclosed to plaintiff prior to trial. In December 2011, the state court ordered an evidentiary hearing on the motion. In April 2012, the prosecution agreed to vacate plaintiff's convictions and plaintiff pled guilty to unlicensed operation of a motor vehicle in full satisfaction of the indictment.

After plaintiff filed a notice of claim and the instant suit, defendants moved to dismiss various claims. The Court: (1) denied the motion as to plaintiff's malicious prosecution claims; (2) dismissed plaintiff's abuse of process claim; and (3) dismissed certain other state law claims against the municipal defendants, but not the individual defendants. (ECF Nos. 44, 45.)

## B. The Criminal Trial

### 1. The Officers' Testimony

Shahzad did not testify at trial. The trial court ruled that if he took the stand, the prosecution could question Shahzad about a prior criminal conviction from 2005.[1] (Tr. 258.)

At trial, the prosecution called the arresting officers, Detective Thomas Storz, who later became involved in the investigation, and Detective Jason Pinsky, the analyst at the FEB who tested the drugs. They testified as follows.

---

[1] Shahzad was previously convicted for grand larceny. (Dep. of Khurram Shahzad at 110, Defs.' Ex. A.)

On June 8, 2007, Officers Veverka and Tait were working in a plainclothes unit and driving an unmarked car when they observed an Audi pull out of a gas station and run a red light. (Tr. 50–51, 55–56.) After the officers turned on their emergency lights, the Audi pulled into the parking lot of a Dunkin Donuts. (Tr. 57–58, 60.) When the officers approached the Audi, they saw Shahzad sitting in the driver's seat. (Tr. 59.) An individual named Robert Kuhns was sitting in the front passenger seat. (Tr. 62.)

When Veverka asked Shahzad for his license and registration, Shahzad gave Veverka a license with a photo that did not look like Shahzad. (Tr. 64.) The name on the license was Saeed Hassan, who is Shahzad's brother. (Tr. 65.) Veverka said to plaintiff, "Is this your license? Is this you? It doesn't even look like you." (Tr. 66.) In response to Veverka's request for his registration, Shahzad opened the glove compartment. (Tr. 67–68, 97) The officers observed "a clear sandwich plastic bag with a big white rock-like substance in it" in the glove compartment. (Tr. 68, 99; see also Tr. 135.) The bag was in plain view in the glove compartment. (Tr. 69.) Tait lifted the folded baggie up, "unraveled it and could clearly see that it appeared to be cocaine."[2] (Tr. 137; see also at 69.) Tait told Veverka that the bag was about half an ounce. (Tr. 116, 123.)

Tait also observed two small, round plastic containers in the glove compartment that appeared to contain marijuana and another round plastic container of marijuana under the passenger seat. (Tr. 113–14, 138–40).

At that point, the officers removed Shahzad and Kuhns from the vehicle. (Tr. 70.) Veverka did a quick pat-down of Shahzad for weapons. (Tr. 70–71, 103.) The officers then handcuffed Shahzad and Kuhns, and Officer Tait then searched them both. (Tr. 71, 73, 103,

---

[2] Both officers testified about their training in identifying controlled substances, including cocaine, and their extensive experience in prior arrests and investigations involving controlled substances. (Tr. 48–49, 69, 125, 135–36.)

117.)  In the pockets of Shahzad's pants, Officer Tait found two plastic Ziploc bags that contained prescription medication.  (Tr. 73, 75, 143.)  In one bag were thirteen small, white pills that had "OC" inscripted on them.  (Tr. 73–74, 143, 194.)  Those pills appeared be Oxycodone.  (Tr. 74, 143.)  The other bag contained four blue pills with "P" on them.  (Tr. 74, 144. 195.)  Those pills appeared to be Percocet.  (Tr. 74, 144.)  The officers later determined that the other pill in the bag was Ativan.  (Tr. 74. 195.)

After Officer Tait found the pills, Shahzad said to the officers, "The pills and the weed are mine, but the coke is Rob's."  (Tr. 76, 119, 146, 164.)  As discussed more fully infra, in defense counsel's summation, defense counsel conceded that Shahzad made this admission, and, in fact, explicitly represented to the jury that, if Shahzad had testified at trial, he would have reiterated the same admission to the jury.

Returning to the trial testimony, after Veverka and Shahzad arrived at the precinct, Shahzad admitted to Veverka that his name was, in fact, Khurram Shahzad, and told Veverka that "the license is my brother's, mine is suspended."  (Tr. 78–79, 120-22, 164.)

Tait was in charge of all the drugs that were recovered.  (Tr. 78, 148.)  At the scene, Tait put all of the drugs in a supermarket shopping bag.  (Tr. 167-68.)

At the precinct, Tait gave the drugs to Detective Storz.  (Tr. 149.)  Storz and Tait weighed the cocaine and pills to determine the proper charge.  (Tr. 192.)  The cocaine weighed more than one-eighth of an ounce.[3]  (Tr. 193.)  Storz then signed and vouchered the evidence along with Burton Fried, another officer at the precinct.  (Tr. 152, 197–98.)  Storz placed the

---

[3]  Shahzad was charged with criminal Possession of a Controlled Substance in the Fourth Degree, which applies to narcotics that weigh more than one-eighth of an ounce.  N.Y. Penal Law § 220.09.  Criminal Possession of a Controlled Substance in the Third Degree applies to narcotics that weigh more than one-half ounce.  N.Y. Penal Law § 220.16.  Shahzad was not charged with third-degree possession.

cocaine and pills into one evidence bag and the marijuana into another evidence bag, and then sealed the bags. (Tr. 193–202, 205–07.) The evidence bags were then sent to FEB for testing.

Pinsky tested the seized substances on June 27, 2007, and confirmed that they were cocaine, marijuana, oxycodone, Percocet and Ativan. (Tr. 237–240, 246–47.) The cocaine weighed .43 ounces. (Tr. 236.) Pinsky testified that one pill of oxycodone, one pill of Percocet and half of the Ativan pill were consumed during testing. (Tr. 237–241.) Pinsky also testified about his handling of the sealed evidence bags and the procedures he followed to document the chain of custody. (Tr. 233–35; see also id. 233–52.)

### 2. Discrepancies in the Testimony about the Drugs

During the trial testimony of the officers, a few discrepancies about the drugs were revealed.

According to the officers, at the time of Shahzad's arrest, they recovered "a clear sandwich plastic bag with a big white rock-like substance in it." (Tr. 68, 99; see also Tr. 135.) Tait also testified that the bag around the cocaine was "in a bunch," "[n]ot completely fully rolled tight." (Tr. 186.) Similarly, Storz, who did not open the bag at the precinct, testified that the bag around the cocaine was "all crumpled and like form fitting around it . . . it was crumpled as if it was tight." (Tr. 220.)

At trial, the officers acknowledged that the cocaine in the evidence bag introduced at trial looked somewhat different. Veverka testified that "the crack-cocaine was more of – more together, like in one ball. It seems to be broken apart now, probably for analysis, I would assume." (Tr. 82.) Tait stated that the cocaine at trial was "in a little different condition" and "appears like it was probably broken up for testing because it was more – solid, more together." (Tr. 152; see also Tr. 153–54 (stating that the cocaine from the glove compartment was "one

solid piece" whereas the cocaine at trial had "one big chunk and the rest broken up"); Tr. 197–99 (testimony from Storz that the "crack cocaine was in a rock-like state which would appear similar to like rock candy" and that the cocaine at trial is a "white powdery substance").)[4]

There were also some discrepancies in the officers' testimony about the bag in which the cocaine was found. Tait testified that the cocaine was in a single bag. (Tr. 186.) However, on cross-examination, defense counsel had Pinsky open the sealed evidence bag and show the jury that the cocaine was actually in two sandwich bags. (Tr. 250.) Pinsky testified that the bags were tied up in a way that, unless someone actually opened the first bag, it would just look like one bag of white, powdery material. (Tr. 250–51.)

As noted earlier, Tait testified that he recovered three round, plastic containers of marijuana from the car. (Tr. 138–40.) However, the evidence bag at trial contained only two plastic capsules. (Tr. 156–57.) Tait testified that the "the marijuana has been removed, it appears to be in a separate little Baggie now, and one of the plastic bubbles is no longer present." (Tr. 158.) Storz told a slightly different story, testifying that Tait only gave him two plastic capsules and that the third piece of marijuana was wrapped in the plastic as it appeared in the evidence bag. (Tr. 207–08.) At trial, Storz referred to third object as a "plastic-type wrap."[5] (Tr. 208; see also Tr. 244 (testimony of Pinsky characterizing this as a cellophane-like cigarette wrapper).)

At the conclusion of the prosecution's case, defense counsel moved to dismiss the marijuana and cocaine charges based on the discrepancies in the appearance and packaging of the drugs. (Tr. 273–280). The court denied the motion. (Tr. 276.)

---

[4] In his closing statement, defense counsel characterized the cocaine at trial as "somewhat clumpy." (Tr. 287.)

[5] The case report prepared by Storz lists "3 Capsules" of marijuana and refers to "three containers" of marijuana. (Defs.' Ex. CC.)

### 3. Defense Counsel's Arguments to the Jury

In his opening statement, defense counsel focused on whether there was reasonable doubt that the cocaine was Shahzad's. (Tr. 40.) Defense counsel told the jury: "[F]orget the oxycodone, forget the Ativan, forget the Percocet, the marijuana, put a check box in all the guilty boxes. That's what was his. The cocaine, though, just like he told the police that night, wasn't his, it was Rob's." (Tr. 42.)

On summation, defense counsel again stressed that the cocaine was not Shahzad's, arguing that: (1) Shahzad's admission to the officers showed that the cocaine was not his; and (2) Shahzad would not have readily opened the glove compartment if he knew the cocaine was there. (Tr. 288.) Defense counsel also pointed to the discrepancies concerning the appearance and packaging of the cocaine and marijuana, and argued that the officers' testimony contained various inconsistencies and was simply "too convenient." (Tr. 292–95.)

Early in his summation, defense counsel reiterated that Shahzad had made the alleged admission to the officers. (Tr. 285.) And, defense counsel again conceded that the Oxycodone and Percocets were found in Shahzad's pocket and that those charges were "not an issue." (Tr. 285.) Counsel also stated, "[i]f you believe that's the marijuana that was found in the car, he says it was his. Not an issue for you to decide." (Tr. 289.)

In his final words to the jury, defense counsel reminded the jury one more time of what Shahzad had admitted to the officers, and explicitly represented that, if Shahzad had testified at trial, he would have reiterated the same admission to the jury. Specifically, defense counsel remarked:

> Khurram, he didn't testify. You didn't hear from him. You didn't really have to. He said everything he needed to say to the police those three years ago and the Judge will tell you can't hold it against him and, really, what was he going to say if got up there?

> He would have told you the same thing that he would have told you three years ago. Three years ago he told the police -- he wanted to be heard by those police officers three years ago when he said, "The pills and marijuana are mine and the coke is Rob's." They wouldn't listen. The District Attorney's Office wouldn't listen.
>
> He wanted you, ladies and gentleman, to hear that and I'm asking you at this point, listen to him. Listen to him and if you do listen to him you have to find him not guilty thank you.

(Tr. 303 (emphasis added).)  Plaintiff was convicted of all charges and sentenced, in December 2010, to two years in prison.  (Compl. ¶ 56.).

## C. Plaintiff's Motion to Vacate His Conviction and Subsequent Guilty Plea to a Lesser Charge

Problems with the FEB became public in December 2010 and the lab was shuttered in February 2011.  The details of the problems at the FEB and its closure are discussed infra.

On September 22, 2011, Shahzad filed a motion with the trial court to set aside his conviction based on the problems at the FEB.  (Pl.'s Ex. Z.)  In response to this motion, the prosecution sent the drugs that were introduced at trial to an independent lab for re-testing. (Prosecution's Mem. of Law at 12, Pl.'s Ex. Z.) However, when the prosecution filed its opposition to the motion on November 10, 2011, it had not yet received the results of the re-test. (Id.)  On December 8, 2011, Justice Tammy S. Robbins, who had presided over Shahzad's trial, ordered an evidentiary hearing on his motion.  (Defs.' Ex. EE.)

On January 23, 2012, the prosecution filed a motion to reargue Justice Robbins's grant of an evidentiary hearing after the independent lab confirmed the accuracy of Pinsky's earlier analysis and identification of the drugs.  (Id.)  In addition to the new independent test results, the prosecution also pointed to a number of unpublished trial court decisions that had denied motions

to vacate convictions based on the problems at the FEB. (Id.) These decisions had not been cited in the prosecution's initial opposition.

On April 18, 2012, Justice Robbins granted, on the prosecution's consent, Shahzad's motion to set aside the verdict. (Defs.' Ex. Z.) The prosecution informed the Court that, although it stood by its original arguments and did not concede the facts alleged in Shahzad's motion, the parties had reached a disposition in the case and, "to facilitate" a plea, the prosecution consented to setting aside the verdict. (Id. at 2–3.) Shahzad then pled guilty, in full satisfaction of the indictment, to one count of Aggravated Unlicensed Operation of a Motor Vehicle in the Third Degree and admitted that he operated a motor vehicle while his license was suspended. (Id. at 3, 9–11.) That charge carried a maximum thirty-day sentence. (Id. at 9.) As part of the plea, Shahzad waived his right to appeal the plea and the sentence. Also, an obstruction of governmental administration charge stemming from an incident that occurred during Shahzad's time in prison was adjourned in contemplation of dismissal. (Id. at 4.) As part of the plea agreement, Shahzad was sentenced to time served. (Id. at 11.)

**D. The Instant Civil Suit and Plaintiff's Deposition Testimony**

**1. Plaintiff's Complaint**

In April 2013, plaintiff filed the instant suit in this Court. Plaintiff's complaint alleges, inter alia, that all of the charges in the indictment against him were false and that he "was not in possession of any illegal substances [and] did not impersonate his brother, . . . operate a motor vehicle with a suspended license or pass a red light." (Compl. ¶ 14.)

Plaintiff's first five causes of action, which allege violations of state law, are explained infra. Plaintiff's sixth "cause of action" alleges, under Section 1983, "Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments [and] Malicious Prosecution and

Deprivation of Liberty Under the Fourth and Fourteenth Amendments." (Compl. ¶¶ 149–59.) Essentially, this "cause of action" alleges malicious prosecution, fabrication of evidence, and Brady violations. Plaintiff alleges that defendants fabricated oral statements where "[p]laintiff admits the possession of controlled substances and the operation of a motor vehicle without a license." (Id. ¶ 150; see also id. ¶ 54.)

Plaintiff's seventh "cause of action" alleges similar claims, with the apparent addition of an abuse of process claim. (Id. ¶¶ 160–69.) This cause of action also alleges that the officers involved in plaintiff's arrest and prosecution, acting in concert with the District Attorney's Office, failed to disclose information to plaintiff that delayed plaintiff's efforts to overturn his wrongful conviction. (Id. ¶¶ 160–69.)

Plaintiff's eighth "cause of action" asserts, against all defendants, a Section 1983 conspiracy and "Unreasonable Search and Seizure" based on, inter alia, allegations that defendants fabricated evidence concerning the events of June 8, 2007 and subsequently covered this up. (Id. ¶¶ 170–76.)

As discussed in further detail infra, plaintiff's complaint also alleges that during his incarceration he was subjected to excessive force and denied appropriate meals, in violation of the Eighth Amendment. (Id. ¶¶ 177–85, 217–25)

In addition to the underlying constitutional violations outlined above, plaintiff's complaint also alleges Monell claims against Nassau County stemming from the actions of the arresting officers, the FEB, the District Attorney's office, and the correction officer defendants. (Id. ¶¶ 187–216, 227–52.)

Finally, plaintiff's complaint alleges various state law claims. (Id. ¶¶ 109–48.) Plaintiff alleges malicious prosecution against the police officer defendants, Pinsky, and Nassau County.

Plaintiff also alleges abuse of process, actual and constructive fraud, and negligent misrepresentation against the police officer defendants and Pinsky, as well as intentional infliction of emotional distress against all of the individual defendants.[6] The complaint also raises a state law claim for negligent hiring, training, and supervision against Nassau County.[7]

### 2. Plaintiffs' Testimony at His 50-H Hearing and Deposition

As explained above, plaintiff's complaint essentially alleges that much of the arresting officers' trial testimony was false. Prior to filing the instant suit, plaintiff filed a notice of claim with the County and was questioned at a 50-H hearing on October 22, 2012. He was also deposed in this suit.

At his 50-H hearing and deposition, plaintiff maintained that he never drove the Audi on June 8, 2007. (Dep. of Khurram Shahzad ("Pl. Dep.") at 30–40, Defs.' Ex. A; 50-H Hearing Tr. ("50–H Tr.") 68, Pl.'s Ex. D.) Rather, plaintiff insisted that he walked to the Dunkin Donuts, where his brother worked. (Pl. Dep. at 29–30; 50-H Tr. 68.) At his deposition, plaintiff explained that Kuhns was fixing the DVD player in the Audi, which was parked in the Dunkin Donuts parking lot. (Pl. Dep. 30.) Plaintiff's brother gave him $300 to pay Kuhns and plaintiff watched Kuhns fix the car. (Id.) The two men were sitting in the car listening to music when the officers approached the car and asked plaintiff for his license and registration. (Id. at 29–31; 50-H Tr. 73, 78.) After plaintiff handed the officers some form of identification, the officers took plaintiff and Kuhns out of the car and searched them and the car. (Pl. Dep. 34; 50-H Tr.

---

[6] The complaint also alleged these state law claims against Nassau County and the Nassau County Police Department. At the outset of this case, defendants filed a motion to dismiss plaintiff's state law claims. The Court denied the motion in part, but dismissed the fraud, negligent misrepresentation, and intentional infliction of emotional distress claims against Nassau County and the police department. (ECF No. 45.) The Court also dismissed plaintiff's abuse of process claim against all defendants, including the individual defendants. (Id.)

[7] Some of plaintiff's claims name the Nassau County Police Department as a defendant. In plaintiff's opposition to the instant summary judgment motion, plaintiff withdrew his claims against the police department because it is not a suable entity.

78.)  At the 50-H hearing, plaintiff testified that the officers told him that they found drugs in the car and then searched plaintiff, but did not find anything on him.[8]  (50-H Tr. 78, 94; cf. Pl. Dep. 36 (stating that plaintiff "believ[ed]" he did not learn that the officers found drugs in the car until the officers told him this at the precinct).)  At his deposition, plaintiff insisted that he:  (1) was innocent of all of the charges against him; (2) was not aware that there were any drugs in the car when got in the car; and (3) had never seen the cocaine.  (Pl. Dep. 40, 111–12.)

Plaintiff's testimony from the 50-H hearing and his deposition diverge in certain respects. Notably, at his deposition, plaintiff did not remember numerous important facts, some of which he had previously testified to at the 50-H hearing.

At the 50-H hearing, plaintiff testified that when the officers asked for his license and registration, he "believed" that he gave the officers his non-motorist identification card—his driver's license was suspended at the time.  (50-H Tr. 78, 81.)  However, when plaintiff was asked at his deposition whether he ever handed the officers his brother's license, plaintiff testified, "I don't remember.  I believe that they found it in his car."  (Pl. Dep. 40; see also id. at 31 ("I just grabbed [my] wallet and handed it to him.  I wasn't sure that I gave him . . . my identification or what I gave to him at the time.")  Also, when plaintiff was asked at his deposition if he told the officers:  "It's my brother's license.  Mine is suspended," plaintiff answered that he did not remember.  (Id. at 39–40.)

More importantly, at plaintiff's 50-H hearing, he denied ever telling the police that the drugs in the car were his, (50-H Tr. 94), or making the statement that "the pills are mine, the coke is Rob's" (id. at 96).  However, when asked at his deposition if he ever told the officers that

---

[8]  At his deposition, plaintiff equivocated about the search, stating, "I believe that when they searched me, they didn't find nothing on me."  (Pl. Dep. 33.)

"The pills are mine. The coke is Rob's," plaintiff did not deny making this statement and simply answered: "I don't remember." (Pl. Dep. 39–40.)

**E.  The Problems at the FEB**

The FEB was part of the Nassau County Police Department. (Ex. FF at 3.) On December 3, 2010, two days after Shahzad was sentenced, the FEB was placed on probation by the American Society of Crime Laboratory/Laboratory Accreditation Board ("ASCLD/LAB") based on an inspection that ASCLD/LAB conducted in November 2010. (Id. at 8.) Such inspections are required by the New York State Commission on Forensic Science. (Id.) At the time, the FEB was the only forensic laboratory in the country under this sanction from ASCLD/LAB. (Id.)

The lab's placement on probation became public on December 7, 2010. (Id. at 134.) In February 2011, Nassau County officials decided to close the entire FEB. (Id. at 10.) As more information about the FEB came to light, it was revealed that ASCLD/LAB had previously criticized the FEB in prior inspections and had, in fact, placed the FEB on probation in 2006.

The New York State Inspector General launched an investigation into the FEB and, on November 10, 2011, released a report into the FEB's history of problems and interactions with ASCLD/LAB, and the failed oversight of the FEB by Nassau County and the State. (See generally id.) In a press release accompanying the report, the Inspector General concluded that "since its creation in 2003, [the FEB] suffered from weak leadership, a dysfunctional quality management system, analysts with inconsistent training and qualifications, and outdated and incomplete testing equipment and procedures." (Pl.'s Ex. T.) According to the Inspector General, the "chronic failures of the [FEB] deprived Nassau County, the criminal justice system, and the public of their right to have complete and unfettered confidence in forensic testing."

(Id.)  The Inspector General's report chronicled the problems at the FEB and the findings of ASCLD/LAB, all of which led to the FEB's closure.

When ASCLD/LAB inspects a laboratory, it examines whether the laboratory meets three different categories of standards:  Essential criteria; Important criteria; and Desirable criteria. (Id. at 25.)  In the fall of 2005, ASCLD/LAB inspected FEB and issued a report finding noncompliance in 21 Essential criteria and 11 Important criteria.[9]  (Id. at 52; Aff. of Lawrence Gerzog in Supp. of Mot. to Set Aside the Verdict ("Gerzog Aff.") at 4, Pl.'s Ex. Z.)  The deficiencies in Essential criteria identified various issues in the controlled substances department, including the use of expired reagents, and the fact that non-working scales were being stored in the same cabinet as working scales.  (Id. at 4.)

When the FEB was re-inspected in July 2006, the inspection found compliance with all Essential criteria, with the exception of one non-compliance concerning hair analysis.  (Id. at 77.) Nevertheless, on August 14, 2006, ASCLD/LAB placed the FEB on probation due to the problems identified in the 2005 inspection report.  (Id. at 79–81.)  ASCLD/LAB took this action despite the fact that "the FEB had already remediated all of the noncompliances and [its] remediation plan had been approved by the ASCLD/LAB lead inspector."  (Id. at 80.)  While on probation, the FEB remained an accredited lab.  (Id. at 81.)  The FEB was the first forensic lab in New York State to be placed on probation by ASCLD/LAB.  (Id.)

In April 2007, ASCLD/LAB re-inspected the FEB and then lifted the FEB's probation on May 17, 2007.  (Id. at 99.)  On June 27, 2007, Pinsky tested the evidence at issue in this case.

---

[9]  The Inspector General's report summarizes the various inspection reports that ASCLD/LAB prepared, over the years, concerning the FEB.  The record before this Court does not include any of the actual reports, only the Inspector General's report.  The Court notes that the motion to vacate that Shahzad filed in state court cites certain facts that are not contained in the Inspector General's report.  None of the supporting exhibits that were filed along with Shahzad's motion to vacate have been provided to this Court.

At some point after the FEB was removed from probation, Lieutenant James Granelle, the director of the FEB, announced his intention to retire from the Nassau County Police Department effective July 12, 2007. (<u>Id.</u> at 100.) Granelle, however, "began to regret his decision after staying home in order to use up vacation time prior to his retirement taking effect" and ultimately withdrew his retirement papers. (<u>Id.</u> at 101.) Around this time, some of Granelle's superiors at the police department had concerns about Granelle's leadership and had heated discussions with him about the 2005 inspection report and the imposition of probation. (<u>Id.</u> at 100.)

In October 2007, ASCLD/LAB conducted another inspection and, in November 2007, issued another report, citing 16 Essential noncompliances in the FEB. (<u>Id.</u> at 103–05.) At least three of these specifically concerned the controlled substances discipline. (Gerzog Aff. at 4.) The 2007 inspection report found, <u>inter</u> <u>alia</u>, that: (1) documentation in the Controlled Substances section did not contain a record of the standards used in testing; and (2) when controlled substances cases involved multiple exhibits of similar specimens, the case records did not state that an examination was performed on each specimen." (Defs.' Ex. FF at 103–05.)

In May 2008, ASCLD/LAB continued the FEB's accreditation after it submitted a remediation plan to address the issues identified in the November 2007 report. (<u>Id.</u> at 105, 109.)

In early November 2010, the FEB was re-inspected by ASCLD/LAB. (<u>Id.</u> at 120.) In a November 24, 2010 report, ASCLD/LAB cited the FEB for 15 Essential noncompliances; the "drug chemistry and latent prints section received the majority of the citations for

noncompliance."[10]  (Id. at 120.)  ASCLD/LAB immediately placed the FEB on probation for one year.  (Id. at 121.).  Problems concerning the controlled substances section that were identified in the November 2010 inspection report included:  "failure to mark all evidence for identification, failure to undertake the requisite controls to ensure the validity of results, the use of a cocaine standard lacking certification and that had not been verified for quantification purposes, the use of undocumented reagents, the failure to properly calibrate sophisticated testing equipment, and the failure to properly documents conclusions and opinions."  (Gerzog Aff. at 5.).  The inspection also found, inter alia, that:

- The drug chemistry section failed to follow policies that required it to maintain chemical inventory, verify the quality of chemicals, and utilize appropriate controls and standards.

- The drug chemistry section drafted misleading reports.  When the drug chemistry section received multiple bags or pills of a substance, it would perform preliminary tests on most or all of the submissions, but would only perform confirmatory tests on approximately 10 percent of the submissions.  However, the reports were drafted in a way that suggested confirmatory tests had been performed on every item analyzed.

(Id. at 122–30.)

The Inspector General's November 2011 report ultimately concluded that the police department failed to communicate the FEB's unfavorable inspections or its probationary status to the Nassau County District Attorney's Office, and that DA Rice did not learn about any of the problems at the FEB until December 2010.  (Id. at 145.)

---

[10]  Plaintiff's motion to vacate his conviction recounts these findings from the November 2010 inspection and report, which, according to plaintiff, criticized FEB for, inter alia, failing "to mark all evidence for identification."  (Gerzog Aff. at 5.)  This point, however, does not explicitly appear in the Inspector General's report.  As noted earlier, the record before this Court does not include the FEB's actual inspection reports, and the current record does not provide any further information about the details of this particular criticism.

## II. DISCUSSION

### A. <u>Standard for Summary Judgment</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating that "no genuine issue of material fact exists. <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

"An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" "while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Konikoff v. Prudential Ins. Co. of Am.</u>, 234 F.3d 92, 97 (2d Cir. 2000) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "When ruling on a summary judgment motion, [the court] must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." <u>Dallas Aerospace, Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 780 (2d Cir. 2003).

### B. <u>Plaintiff's Claims Concerning His Arrest, Prosecution, and Conviction</u>

Plaintiff asserts a Section 1983 <u>Brady</u> claim concerning the County's failure to disclose problems at the FEB. Plaintiff also pursues other Section 1983 claims, including malicious prosecution and fabrication of evidence, and contests the officers' account of plaintiff's arrest and their testimony at trial.[11]

Defendants contend that all of plaintiff's claims are barred by <u>Heck v. Humphrey</u>, 512 U.S. 477, 486 (1994), because plaintiff pled guilty to one of the charges. As explained below,

---

[11]  The conclusory nature of the allegations contained in plaintiff's complaint (combined with plaintiff's decision to allege multiple claims within a single "cause of action") make it difficult to determine the precise basis for some of his claims.  Plaintiff's papers filed in opposition to the motion for summary judgment do little to clarify his claims.

while plaintiff's <u>Brady</u> claim is not barred by <u>Heck</u>, his other claims are all either barred by <u>Heck</u> or time-barred. Although plaintiff's <u>Brady</u> claim survives <u>Heck</u>, it fails on the merits because no reasonable jury could conclude that the undisclosed evidence about the FEB was material under <u>Brady</u>.

**1. <u>Heck</u>**

*a. The <u>Heck</u> Rule*

Under the rule set out in <u>Heck v. Humphrey</u>,

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]

<u>Heck</u>, 512 U.S. at 477. "Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." <u>Id.</u>

Defendants argue that <u>Heck</u> bars all of plaintiff's Section 1983 claims because he pled guilty to the charge of driving with a suspended license. Plaintiff's primary argument is that <u>Heck</u> is only relevant to prisoners who are in custody and have a right to file a writ of habeas corpus, and, thus, has no application to plaintiff, who is not in custody. According to plaintiff, since <u>Heck</u> is inapplicable as a threshold matter, plaintiff's plea is only relevant to the extent that it would bar a claim under the principles of collateral estoppel. Plaintiff also argues, in cursory fashion, that even if <u>Heck</u> is applicable to plaintiff as a threshold matter, it does not bar the claims he raises here.

*2. The Threshold <u>Heck</u> Question*

Plaintiff argues that, as a threshold matter, <u>Heck</u> does not apply to him because he is not in custody. The Court disagrees.

In <u>Poventud v. City of New York</u>, 750 F.3d 121, 136 (2d Cir. 2014), the Second Circuit, sitting <u>en banc</u>, grappled with the application of <u>Heck</u> to a case that is procedurally similar to plaintiff's suit. In <u>Poventud</u>, the plaintiff was convicted of attempted murder. A state court subsequently granted Poventud's post-conviction motion to vacate and granted him a new trial, finding that the prosecution failed to disclose <u>Brady</u> material. Poventud then pled guilty to attempted robbery and brought a Section 1983 claim seeking damages for the <u>Brady</u> violation. After the district court dismissed Poventud's claim as barred by <u>Heck</u>, a divided panel of the Second Circuit reversed the district court, concluding that <u>Heck</u> did not apply because Poventud was not in custody and, thus, had no federal habeas remedy. <u>Poventud v. City of New York</u>, 715 F.3d 57 (2d Cir. 2013). Judge Jacobs dissented, reasoning that <u>Heck</u> applied because, <u>inter alia</u>, the plaintiff pled guilty and chose not to challenge his plea. <u>Id.</u> (Jacobs, J., dissenting).

The Second Circuit then took the case <u>en banc</u> to address the <u>Heck</u> question. <u>Poventud</u>, 750 F.3d 121. However, the <u>en banc</u> majority decision ultimately did not reach this question and instead reversed the district court on a narrower ground. The <u>en banc</u> majority concluded that, even if <u>Heck</u> applied to Poventud as a threshold matter, <u>Heck</u> did not bar Poventud's <u>Brady</u> claim because that claim, grounded in an alleged violation of due process, only concerned Poventud's vacated conviction and did not relate to his later plea, which was untainted by the <u>Brady</u> violation. Judge Jacobs, joined by five other judges, again dissented, reiterating the view that, as a threshold matter, Poventud had to satisfy <u>Heck</u>, and also concluding that <u>Heck</u> barred his <u>Brady</u> claim.

The applicability of <u>Heck</u> to the circumstances of the instant case is an open question in this Circuit and I conclude, in line with the reasoning of Judge Jacobs, that <u>Heck</u> applies here, as a threshold matter, because it was not "'impossible as a matter of law' for [plaintiff] to challenge his conviction and thereby satisfy <u>Heck</u>'s favorable termination requirement." <u>Poventud</u>, 715 F.3d at 75 (Jacobs, J., dissenting) (quoting <u>Spencer v. Kemna</u>, 523 U.S. 1, 21, (1998) (Souter, J., concurring)); <u>Poventud</u>, 750 F.3d at 164–65 (Jacobs, J., dissenting). It is unnecessary to recite the comprehensive discussions of this issue set out in the now-vacated <u>Poventud</u> panel decision and Judge Jacobs' dissents. I note that in <u>Leather v. Eyck</u>, the Second Circuit held that <u>Heck</u> did not apply to a plaintiff who was "successfully prosecuted" (<u>i.e.</u>, convicted at trial), assessed only a fine, and then failed to pursue an appeal in state court. 180 F.3d 420, 422 (2d Cir. 1999). <u>Leather</u>, however, is factually distinguishable from this case—unlike Shahzad, the plaintiff in <u>Leather</u> was merely fined, did not plead guilty, and had no possibility of pursuing a federal habeas petition. The Second Circuit, however, has not addressed the applicability of <u>Heck</u> to the situation here–while incarcerated, plaintiff filed a post-conviction motion to vacate his conviction, and resolved that motion in conjunction with pleading guilty to a lesser charge and waiving his right to appeal.[12] Cf. <u>Teichmann v. New York</u>, 769 F.3d 821, 827 (2d Cir. 2014) (Livingston, J., concurring) ("[The Second Circuit has] never said that a plaintiff's access to § 1983 turns on whether he has intentionally caused habeas to be unavailable. We have recognized an exception to <u>Heck</u>'s favorable termination requirement when habeas was never reasonably available to the plaintiff through no lack of diligence on his part—that is, where an

---

[12] Judge Jacobs' analyses of the threshold <u>Heck</u> issue rest on two propositions. First, Judge Jacobs maintains that prior Second Circuit decisions, such as <u>Leather</u>, misinterpret <u>Heck</u> because, according to Judge Jacobs, there are no exceptions to <u>Heck</u> for plaintiffs who are not in custody, irrespective of their circumstances. Second, Judge Jacobs asserts that even if there are certain exceptions to <u>Heck</u> for plaintiffs who are not in custody, those exceptions were not applicable to Poventud because it was not "impossible as a matter of law" for him to challenge his conviction. <u>Poventud</u>, 750 F.3d at 164; <u>Poventud</u>, 715 F.3d at 75. This Court's decision on the <u>Heck</u> question relies on Judge Jacob's latter rationale.

action under § 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum.").  Accordingly, I conclude that, as a threshold matter, Heck applies to plaintiff's suit.  The remaining question is whether plaintiff's specific claims necessarily imply the invalidity of his conviction and, thus, are ultimately barred by Heck.

### c. Application of Heck to Plaintiff's Claims

In Poventud, the majority decision observed:

> Not every § 1983 claim that arises out of a criminal case requires that the underlying criminal process reach a favorable termination. . . . Heck does not automatically bar a § 1983 claim simply because the processes of the criminal justice system did not end up in the plaintiff's favor.  A plaintiff need not prove that any conviction stemming from an incident with the police has been invalidated, only a conviction that could not be reconciled with the claims of his civil action.

750 F.3d at 132 (citations omitted).

Defendants argue that all of plaintiff's Section 1983 claims are barred by his guilty plea. Plaintiff disagrees, simply citing to the standard above.  Plaintiff does not address any of the specific claims at issue or attempt to explain why Heck is inapplicable to those claims.

Plaintiff's Brady claim is not barred by Heck.  Plaintiff's Brady claim, which concerns impeachment evidence, is similar in relevant respects to the Brady claim in Poventud that the en banc majority decision concluded was not barred by Heck.  However, as explained below, Heck precludes plaintiff's other claims.

For plaintiff's malicious prosecution claim, one required element is termination of the proceeding in favor of the accused.  Poventud, 750 F.3d at 130.  "[I]t is hornbook law that where charges are withdrawn or the prosecution is terminated by reason of a compromise into which the accused has entered voluntarily, there is no sufficient termination in favor of the accused." Id. (quoting Smith-Hunter v. Harvey, 734 N.E.2d 750, 751 (N.Y. 2000) (internal marks

omitted)).  "In the context of § 1983 malicious prosecution cases, <u>Heck</u>'s bar is coextensive with the favorable termination requirement."  <u>Id.</u>  Here, plaintiff pled guilty to the unlicensed driving charge in satisfaction of the indictment.  Thus, he did not obtain a favorable termination and his malicious prosecution claim must be dismissed.  Similarly, to the extent that plaintiff is raising a false arrest claim, plaintiff's guilty plea precludes that claim as well.[13]  <u>See</u> <u>Cameron v. Fogarty</u>, 806 F.2d 380 (2d Cir. 1986).

Plaintiff's fabrication of evidence claim is also barred by <u>Heck</u>.  Plaintiff pled guilty to operating a motor vehicle while his license was suspended.  As defendants point out, plaintiff now maintains that he never drove the vehicle and did not operate a vehicle with a suspended license.  (<u>See</u> Pl.'s Br. at 1.)  Plaintiff contends that the police fabricated evidence, including their observations of him driving and his oral admission that he was operating "a motor vehicle without a license," (Compl. ¶ 150).  These allegations necessarily imply the invalidity of plaintiff's guilty plea.  Plaintiff makes no attempt to explain how his guilty plea is a "'clean' conviction, untainted by" the officers' alleged fabrications.  <u>Poventud</u>, 750 F.3d at 136; <u>see</u> <u>also</u> <u>id.</u> (explaining that because Poventud was aware of the alleged exculpatory material prior to his guilty plea, "a favorable judgment in this § 1983 action would not render invalid any subsequent, plea-based judgment against Poventud").  Accordingly, plaintiff's fabrication of evidence claim

---

[13]  In addition to their <u>Heck</u> argument, defendants also contend that plaintiff's claims are barred by the statute of limitations.  Defendants are correct that any false arrest claim is time-barred because plaintiff's false arrest claim necessarily accrued on the date of his arrest in 2007, and he did not file the instant suit until 2013.  <u>See</u> <u>Wallace v. Kato</u>, 549 U.S. 384, 385 (2007).  The Court notes that plaintiff argues that he is entitled to equitable tolling on all of his claims because he did not become aware of the deficiencies in the FEB until December 2010.  Plaintiff's false arrest claim, however, has nothing to do with the FEB.

is dismissed.[14]  Cf. Younger v. City of New York, 480 F. Supp. 2d 723, 726 (S.D.N.Y. 2007) (finding that Heck barred plaintiff's due process claim and other claims when he was charged with three counts of child endangerment, resisting arrest, and obstruction of governmental administration and only pled guilty to the latter charge); Perez v. Cuomo, 09-CV-1109, 2009 WL 1046137, at *7 (E.D.N.Y. Apr. 17, 2009) (holding that, under Heck, plaintiff's conviction barred his Section 1983 fair trial claim based on fabrication of evidence).   For the same reasons, plaintiff's eighth cause of action, which alleges a conspiracy concerning the allegedly fabricated evidence, is also barred by Heck.

Finally, the Court notes that plaintiff alleged abuse of process, along with other Section 1983 claims, as part of the seventh cause of action in his complaint.  Neither side addresses any of the particulars of this claim.  Given that plaintiff's state law abuse of process claim has already been dismissed, it is not clear how plaintiff's Section 1983 abuse of process claim could be viable.  In any event, abuse of process claims under Section 1983, like claims for false arrest, generally accrue when legal process is initiated.  See Hadid v. City of New York, 15-CV-19, 2015 WL 7734098, at *5 (E.D.N.Y. Nov. 30, 2015).  Since plaintiff was arrested in 2007, any abuse of process claim is time-barred.  And, the Court fails to see how plaintiff's equitable

---

[14]   Defendants did not seek summary judgment on the merits of plaintiff's fabrication of evidence claim. Nevertheless, the Court notes that even if the Heck bar did not apply, the Court has serious doubts about whether this claim would survive a summary judgment motion on the merits.  Plaintiff alleges, inter alia, that the officers fabricated plaintiff's oral statement in which he "admits the possession of controlled substances."  (Compl. ¶ 150.) At his 50-H hearing, plaintiff denied making this admission.  However, at his deposition in this action, he did not deny this statement and testified that he did not remember whether he made the statement.  Of course, at the criminal trial, Shahzad's counsel explicitly represented to the jury that Shahzad had made this admission and would have repeated it to the jury if he had taken the stand.  While inconsistencies in a plaintiff's testimony are ordinarily for the jury to resolve, in certain rare instances where a plaintiff's uncorroborated claims are contradicted by his own testimony and his admissions, summary judgment against the plaintiff may be appropriate.  See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir. 2011); Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005); Cruz v. Reiner, 11-CV-2131, 2013 WL 5676303, at *3 (E.D.N.Y. Oct. 16, 2013) (collecting cases), appeal pending.  This may be one of those cases.  Moreover, as noted earlier, at his deposition, plaintiff failed to substantiate other allegations he made against the officers.

tolling argument concerning the revelations about the FEB has any relevance to the abuse of process claim.  (See n. 15 supra.)

## 2.  Merits of the Brady Claim

Under Brady v. Maryland, 373 U.S. 83 (1963), "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  United States v. Cacace, 796 F.3d 176, 183 (2d Cir. 2015) (quoting United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001)), cert. denied., 136 S.Ct. 856 (2016), and, cert. filed sub nom., Saracino v. United States, No. 15-8581 (Mar. 11, 2016).  Evidence is material if it "'could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  Coppa, 267 F.3d at 140 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).  "Accordingly, even when the government fails to disclose favorable information to the defense, a Brady violation still requires "a 'reasonable probability' that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed."  Cacace, 796 F.3d at 183-84 (quoting United States v. Rodriguez, 496 F.3d 221, 227 (2d Cir. 2007)).  A "'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome.'"  DiSimone v. Phillips, 461 F.3d 181, 196 (2d Cir 2006) (quoting United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005)).  The relevant question "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Defendants argue that any undisclosed evidence about the FEB was not material because: (1) when Pinsky tested the drugs on June 27, 2007, the FEB was not even on probation, which had been lifted in May 2007; and (2) the 2011 re-testing of the drugs confirmed Pinsky's

conclusions about the drugs. As noted earlier, the re-testing of the drugs was the basis for the prosecution's motion to vacate Justice Robbins' order that had granted plaintiff an evidentiary hearing.

Plaintiff responds that the lifting of the FEB's probation in May 2007 cannot bar his Brady claim because the November 2007 inspection again found numerous instances of non-compliance and Granelle, the FEB director, was in the process of retiring and using his accrued vacation around the time that the drugs in this case were tested. Plaintiff also cites the Inspector General's general conclusions from her press release about the systemic problems at the FEB.[15]

Plaintiff also points to testimony from Pinsky's deposition indicating that: (1) if Pinsky had been in charge he would have run the FEB differently than Granelle; (2) Pinsky's report on the testing of the drugs in this case did not state what tests he performed and did not state how the cocaine was packaged; (3) Pinsky never received any formal education in forensic evidence science; and (4) ASCLD/LAB "cited" Pinsky (presumably during the 2010 inspection) for not following a specific procedure that required technicians to cross-reference samples with the lab's internal library or two external samples. (Pl.'s Br. at 7.)

Plaintiff argues that the failure to disclose evidence to him "related to the lab malfeasance, chain of custody, and the testimony of [Pinsky] as an expert" violated his rights. (Id.) Plaintiff's brief also appears to incorporate, by reference, plaintiff's state court motion to vacate, which cites to the various deficiencies outlined in ASCLD/LAB's 2005, 2007 and 2010 inspection reports. Plaintiff's motion in state court argued that the undisclosed evidence about

---

[15] While plaintiff cites to the Inspector General's conclusions from her press release, plaintiff's 56.1 statement and opposition brief are (with a few minor exceptions) devoid of any citations to the Inspector General's report and do not rely on the vast majority of the Inspector General's specific findings. The only portions of the Inspector General's report cited by plaintiff are three pages of the report that discuss Granelle's aborted retirement in 2007, criticisms of his leadership, and the November 2007 inspection report. (Pl.'s Br. at 7; Pl.'s 56.1 ¶¶ 108, 111.)

the FEB would have undermined Pinsky's credibility, the reliability of his test results, and his qualification as an expert. (Mot. to Set Aside, Pl.'s Ex. Z.) That motion also noted the disparities concerning the drugs introduced at trial and argued that the problems at the FEB bore directly on those issues "as well as the overall issue of the identification and quantification of the substances, which the People must prove beyond a reasonable doubt." (Gerzog Aff. at 6.)

As explained below, no reasonable jury could conclude that there was a reasonable probability that a different verdict would have resulted from disclosure of the evidence about the FEB. Plaintiff's <u>Brady</u> claim ultimately fails because the drugs were re-tested, the evidence of plaintiff's guilt at trial was overwhelming, and the undisclosed evidence had little, if any, impeachment value to critical issues in this case.

It is proper to consider the re-test in the <u>Brady</u> materiality analysis. <u>See</u> <u>People v McCants</u>, 938 N.Y.S.2d 229 (N.Y. Sup. Ct. 2011) (unreported disposition) (denying motion to vacate conviction where Pinsky tested drugs because, <u>inter alia</u>, independent testing confirmed results); <u>McCants v. Hallenback</u>, 13-CV-5587, 2014 WL 4638836, at *1 (E.D.N.Y. Sept. 16, 2014) (denying McCants's habeas petition challenging state court's denial of motion to vacate); <u>see also</u> <u>United States v. Gale</u>, 314 F.3d 1, 4–5 (D.C. Cir. 2003) (holding that the government's failure to disclose impeachment evidence about a drug trade expert was not material because the government would have been able to replace the expert with a similarly qualified witness), <u>rehearing denied</u>, 326 F.3d 228, 229 (D.C. Cir. 2003); <u>United States v. Brown</u>, 08-10050, 2015 WL 1268159, at *4 (D. Mass. Mar. 19, 2015) (rejecting <u>Brady</u> claim in motion to vacate conviction where lab chemist engaged in egregious misconduct because, <u>inter</u> <u>alia</u>, "if the misconduct had been discovered before trial, the most probable outcome would have been retesting by another, presumably trustworthy agency"). Plaintiff does not argue otherwise.

Given the results of the re-test, plaintiff's only remaining argument is that the broader problems at the FEB could be used to impeach the chain of custody in this case. Plaintiff is left to argue that in light of the discrepancies about the drugs in the trial testimony and the problems at the FEB—maybe, just maybe—Pinsky mixed up the white substance seized by the officers (and identified by them and the plaintiff as cocaine) with a sample of cocaine of similar weight.

However, the evidence of plaintiff's guilt at trial was overwhelming. Cf. McCants, 938 N.Y.S.2d 229 (denying motion to vacate conviction where Pinsky tested drugs because, inter alia, defendant confessed to selling cocaine and independent lab confirmed the results); United States v. Carvahlo, 109 F. Supp. 3d 441, 445 (D. Mass. 2015) (denying Brady claim in motion to vacate conviction where, although one chemist in drug lab had engaged in egregious misconduct and the lab had other systemic problems, the record "overwhelmingly" showed that the defendant was carrying crack cocaine on the night of this arrest).

At trial, the officers testified that, on June 8, 2007, they seized a bag containing a white substance, which they believed to be cocaine, along with three containers of what appeared to be marijuana, thirteen oxycodone pills, four Percocet pills, and one pill of Ativan. At the scene, plaintiff admitted that the substances were cocaine and marijuana—an admission that defense counsel explicitly confirmed during plaintiff's criminal trial. Cf. People v. Wicks, 505 N.Y.S.2d 171 (N.Y. App. Div. 2d Dep't. 1986) (affirming conviction where defendant raised arguments about drug testing and noting that the court also found "it significant" that the defendant testified that he believed he was selling cocaine). Defense counsel also confirmed that plaintiff admitted that the marijuana and pills were his. Officers testified that the cocaine was vouchered and placed in a sealed evidence bag along with all of the pills, and the marijuana was vouchered and placed in a separate sealed evidence bag. Moreover, although there were some discrepancies at

trial concerning the appearance and packaging of the drugs, there was also additional evidence at trial concerning the weight of the white substance seized on June 8, 2007 that further confirmed that this was the same cocaine that was introduced at trial. The cocaine introduced at trial weighed approximately .43 ounces, a fact confirmed by the re-test. (Pls.' 56.1 ¶ 113.) At trial, the officers testified that, upon taking the bag out of the glove compartment, Tait remarked that it looked like half an ounce. Moreover, the officers testified that they weighed the cocaine on June 8, 2007 in order to determine the appropriate charges against plaintiff, and that it weighed more than one-eighth of an ounce. Although the arrest and case reports authored in June 2007 do not indicate the precise weight of the substance that the officers weighed on June 8, it must have weighed between one-eighth of an ounce and one-half of an ounce because plaintiff was only charged with fourth-degree possession. Finally, the fact that the cocaine and the seized pills were all secured in the same sealed evidence bag further undermines any suggestion that the cocaine introduced at trial was not the same cocaine seized by the officers. Notably, there were no discrepancies at trial concerning the seized pills. All of the pills included in the evidence bag containing the cocaine were properly accounted for minus the one pill of oxycodone, the one pill of Percocet, and the half-pill of Ativan that were consumed in the testing.

Of course, Shahzad did not testify at his criminal trial to rebut the officers' account of their interactions with him on the day of his arrest.[16] Shahzad does not argue that disclosure of the problems at the FEB would have (or even might have) altered this strategic decision by his criminal defense counsel. And, even if Shahzad had raised this argument, it is utterly meritless. No reasonable jury could conclude that impeachment evidence concerning the FEB would have

---

[16] Even if defense counsel had not explicitly confirmed plaintiff's statement that the pills and marijuana were his, but the cocaine was Kuhns's, the jury would have had no reason to doubt the officers' unrebutted testimony on this point.

impacted the defense strategy not to call Shahzad to the stand. Evidence about the problems at the FEB is irrelevant to the testimony of the arresting officers on the scene.

Moreover, the various problems identified at the FEB had negligible, if any, impeachment value to the only remaining question about the drugs: was the cocaine at trial the same substance that the officers seized when they arrested plaintiff?[17] The problems at the FEB concern scientific and technical flaws in the FEB's testing and procedures, and the FEB's general failures in management, oversight, and quality control.[18] (See Defs.' Ex. FF at 52–57, 102–105, 120–130 (Inspector General's report recounting criticism from 2005, 2007, and 2010 inspections).) Those problems certainly cast some doubt on the validity of tests performed by the FEB. However, the drugs at issue here have been re-tested. As noted earlier, plaintiff is left to suggest that maybe Pinsky mixed up the substance seized by the officers with a sample of cocaine of similar weight. Not only is this scenario more than far-fetched, but plaintiff does not point to anything in the alleged Brady material to suggest that the analysts in the drug chemistry section—and, critically, Pinsky in particular—were committing the egregious error of mixing up the evidence from the cases of two different defendants.[19] Cf. McCants, 938 N.Y.S.2d 229 (denying motion to vacate defendant's conviction based on documents about the FEB's 2005

---

[17] In addition to the issue about the cocaine, there was conflicting testimony from the officers at trial about whether one plastic container of marijuana was missing from the evidence bag. However, even if this raised questions about one of the three marijuana samples, the re-testing confirmed that the other two samples contained marijuana. Of course, plaintiff also admitted that he possessed marijuana.

[18] Contrary to defendants' assertion, the fact ASCLD/LAB lifted FEB's probation in May 2007 is not, standing alone, necessarily dispositive of the materiality issue. As plaintiff notes, ASCLD/LAB identified more deficiencies when it inspected the FEB again in October 2007. That said, the impeachment value of the 2006 probation determination and the ASCLD/LAB's 2005 and 2007 inspection reports is certainly diminished by ASCLD/LAB's decision to lift the FEB's probation in 2006 and its decision in 2008 to reaccredit the FEB despite the problems identified in the November 2007 inspection report.

[19] In fact, the only piece of alleged Brady material that explicitly concerns Pinsky is his admission at his deposition that ASCLD/LAB cited him for failing to follow one specific scientific protocol required for one type of test. While this technical criticism may have been useful to impeach Pinky's testimony about his conclusions concerning such a test, it has nothing to do with the chain of custody issues in this case.

inspection report and 2006 placement on probation decision because, <u>inter alia</u>, Pinsky was not mentioned in these documents).

In light of the above, no reasonable jury could conclude that there was a reasonable probability that a different verdict would have resulted from the undisclosed evidence about the FEB.

### 3. Defendants' Other Challenges to Plaintiff's § 1983 Claims Concerning His Arrest, Prosecution, and Conviction

Defendants also challenge plaintiff's § 1983 claims on various other grounds. (See Defs.' Br. at 10–11, 16–22.) Because the Court has concluded that all of plaintiff's § 1983 claims concerning his arrest, prosecution, and conviction are either barred by <u>Heck</u>, the statute of limitations, or, in the case of the <u>Brady</u> claim, fail on the merits, the Court does not reach defendants' additional arguments.

Finally, because the Court has already concluded that defendants are entitled to summary judgment on all of plaintiff's underlying § 1983 claims concerning his arrest, prosecution, and conviction, the Court will also grant defendants summary judgment on plaintiff's <u>Monell</u> claims that concern his arrest, prosecution, and conviction.

### 4. Plaintiff's State Law Claims Concerning his Arrest, Prosecution, and Conviction

Defendants argue that the outstanding state law claims against the police officer defendants and Pinsky are barred by qualified immunity and that the state law claims against DA Rice and Finley are barred by absolute immunity.[20] Defendants also argue that certain state law claims are barred by the statute of limitations based on the timing of plaintiff's filing of his

---

[20] In their opening brief, defendants refer only to plaintiff's state law claims for malicious prosecution, and negligent hiring, training, and supervision. Thus, defendants seem to suggest that those are the only remaining state law claims. Defendants simply ignore plaintiff's state law claims against the individual defendants for fraud, negligent misrepresentation, and IIED. Although the Court's earlier decision on defendants' Rule 12(b)(6) motion dismissed those claims against the municipal defendants, those claims were not dismissed against the individual defendants.

notice of claim.  Finally, defendants assert, in one sentence, that plaintiff's state law claims have no merit.

The Court grants defendants summary judgment on plaintiff's state law malicious prosecution claim.  That claim fails for the same reason as plaintiff's § 1983 malicious prosecution claim—plaintiff did not receive a favorable termination.

The Court, however, will decline to exercise supplement jurisdiction over plaintiff's remaining state law claims concerning his arrest, prosecution, and conviction.  Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim" if "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction."  The Court has already concluded that defendants are entitled to summary judgment on all of plaintiff's federal claims concerning his arrest, prosecution, and conviction.  As explained below, the Court is denying summary judgment on plaintiff's excessive force claims.  Those claims, however, involve discrete incidents during plaintiff's incarceration and, thus, have no connection to plaintiff's state law claims concerning his arrest, prosecution, and conviction.  Moreover, none of the correction officer defendants are implicated in plaintiff's state law claims concerning his arrest, conviction, and prosecution.  When the Court enters a final judgment in this case at the conclusion of plaintiff's excessive force trial, the Court will dismiss the state law claims concerning plaintiff's arrest, prosecution, and conviction without prejudice.

## C.  Plaintiff's Claims Concerning His Treatment in Prison

Plaintiff alleges that:  (1) he was subjected to excessive force on three occasions while incarcerated; (2) plaintiff's rights under the Eighth Amendment were violated because he was denied special meals necessitated by his allergy to turkey; and (3) the corrections officer

defendants engaged in an unlawful conspiracy under 42 U.S.C. § 1983 and 42 U.S.C. § 1985.[21]

Defendants argue that they are entitled to summary judgment on these claims because: (1) these claims fail on the merits; and (2) plaintiff did not properly plead these claims in his complaint. As explained below, while plaintiff's excessive force claims survive judgment, defendants are entitled to summary judgment on the remaining claims. Before addressing the substance of these claims, the Court must first address defendants' argument that plaintiff's allegations fail to state a plausible claim.

Defendants argue that all of these claims should be dismissed because the allegations in plaintiff's complaint concerning these claims are conclusory, do not plausibly allege that any constitutional violations occurred, and fail to identify the date, time, and place of the various incidents. While defendants certainly have a colorable argument that the allegations in plaintiff's complaint would be insufficient to survive a motion to dismiss, defendants should have pursued this argument at the outset of the litigation. Discovery is now complete and defendants have moved for summary judgment. Accordingly, the Court will not entertain a pleading challenge at this stage, and will, instead, consider plaintiff's claims based on the factual record before the Court. It would make little sense, at this point, to dismiss plaintiff's complaint based on the plausibility standard if facts that are already in the record would allow plaintiff to survive summary judgment—in that case, the plaintiff could easily cure any pleading deficiencies. The Court may have been more receptive to defendants' argument if they had contended that

---

[21] As with plaintiff's other claims, the two "causes of action" alleged in plaintiff's complaint concerning his treatment in prison are each a hodgepodge of multiple claims. Based on plaintiff's summary judgment papers, the Court assumes that the only federal claims that plaintiff is pursuing concerning his incarceration involve the three excessive force incidents, the Eighth Amendment meal claim, the § 1983 and 1985 conspiracies, and related <u>Monell</u> claims. The Court notes that defendants argue that some of plaintiff's claims may be barred by a November 2009 settlement that plaintiff entered into with Nassau County. This settlement resolved a civil rights suit that plaintiff brought stemming from an incident in which other inmates assaulted plaintiff in August 2007. (Pl.'s 56.1 ¶¶ 121–24.) Any claims that plaintiff may have based on incidents in prison that occurred prior to November 2009 are likely barred by the release in this settlement agreement. However, plaintiff's summary judgment papers do not articulate any such claims.

plaintiff's allegedly inadequate pleading prejudiced them in their defense of this action. Defendants, however, say nothing about prejudice.

**1. Excessive Force Claims**

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." Id. (citations and internal marks omitted). "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). The objective inquiry is "contextual and responsive to 'contemporary standards of decency.'" Hudson, 503 U.S. at 8.

Plaintiffs' excessive force claims concern three incidents: a July 3, 2011 incident involving Officer Hardy, a September 9, 2011 incident involving Hardy, and a January 3, 2012 incident involving Officer Daley. Defendants argue that any force the officers used on these occasions was applied in a good-faith effort to maintain or restore discipline, and that the officers are also entitled to qualified immunity on these claims.[22]

Plaintiff's evidence about these three incidents raises factual issues that preclude summary judgment on those claims. Accordingly, the Court denies defendants summary judgment on these excessive force claims.

---

[22] Defendants did not address the September 9, 2011 incident in their 56.1 statement or in either of their briefs. Plaintiff raised this incident in his brief.

### 2. Eighth Amendment Meals Claim

#### a. Background

##### *i. Plaintiff's Deposition Testimony*

The first time that plaintiff received turkey in prison, he had an allergic reaction and was rushed to the medical office. (Pl. Dep. 117.) Prison doctors told plaintiff that he was probably allergic to turkey and that whenever turkey was on the prison menu, he should refuse it and would receive something else. (Id. at 117–119.) Unfortunately, the prison often served turkey. (Id.)

Plaintiff claims that, despite his turkey allergy, he was often still served turkey meals, which he would not eat. (Id. at 119.) Plaintiff also testified that sometimes, instead of the scheduled turkey meal, he would receive mashed potatoes or chickpeas with rice. (Id. at 120–21.) As explained below, there is also evidence that, when turkey was on the menu, plaintiff instead received meals with eggs, salad, and noodles.

When plaintiff received a meal with turkey he would take it to the "bubble" where the correction officer was stationed and would tell the officer that he could not eat his meal. (Id. at 118–20.) Plaintiff testified that he told more than ten officers that he was allergic to turkey. (Id. at 120.) Plaintiff testified that he dealt with many different officers because the facility kept "transferring" plaintiff and not giving him food. (Id. at 120.) However, the only specific officer that plaintiff identified at his deposition was one "Officer Nolan." (Id. at 120.)

At his deposition, plaintiff estimated that he missed four or five meals per week. (Id. at 122.) Plaintiff does not provide any time frame for when this occurred. At his deposition, plaintiff maintained that he wrote down his missing meals, wrote letters about the problem, made sick calls, and talked to "everybody," including Internal Affairs. (Id.)

Plaintiff testified that he lost a lot of weight because of his missed meals, but could not recall how much weight he lost. (Id.) At his deposition, plaintiff indicated that his weight should be listed in his medical records. (Id.) Plaintiff, however, has not submitted any medical records in support of his claim, and, as explained below, the prison's response to one of his grievances notes that, according to medical records, he gained weight while incarcerated.

### ii. Plaintiff's Grievances, Letters, and Notes

The record contains multiple grievances, letters, and other documents authored by plaintiff concerning his meals. Some of these documents appear to be notes that plaintiff wrote to himself, but never sent to anyone at the prison. Most of these grievances, letters, and other documents fail to support, and sometimes contradict, the vague assertions plaintiff made at his deposition about missing meals and the effects of this on his health. Each of these documents is addressed below. Significantly, the Court notes that although plaintiff was apparently incarcerated from December 2010 through April 2012, plaintiff's grievances and other documents about meals are generally limited to an approximately six-week period between November 28, 2011 and January 3, 2012. (Pl.'s Ex. W.)

The first grievance in the record concerning meals at the Nassau County jail is dated November 28, 2011.[23] (Id.) In this grievance, plaintiff states that he is "still receiving diet tray no turkey" and "believe[s]" that he lost almost 15 pounds in two weeks. (Id.) This grievance says nothing about missed meals.

---

[23] The record contains one undated grievance in which plaintiff complains that although the kitchen is aware of his allergy he keeps getting turkey meals. (Pl.'s Ex. W.) In this grievance, plaintiff also requested Kosher food for Ramadan; a request that was denied. (Id.) However, the heading on this grievance states: "Monmouth County's Sherriff' Office" and includes the notation "ICE" on it. After plaintiff's indictment was dismissed in April 2008, plaintiff spent time in immigration custody. (See Pl. Dep. 21.) This grievance appears to have been filed by plaintiff while he was in immigration custody and is irrelevant to the claims at issue here. Notably, neither party addresses this point.

On December 13, 2011, plaintiff sent a letter to Internal Affairs stating that he received food that he was allergic to and that when he told an unnamed officer about it, the officer allegedly told him, "you get this because you like to write a lot [sic] grievance against every body." (Id.)

The record contains a handful of grievances and letters authored by plaintiff between December 15, 2011 and January 3, 2011 in which plaintiff requests to see a dietician as soon as possible. (Id.) Some of these grievances note that plaintiff did not eat the past few days and was losing weight because he was not eating properly. These grievances do not explicitly state that plaintiff was not receiving appropriate meals. The prison's December 19, 2011 response to plaintiff's December 15, 2011 grievance indicates that plaintiff has gained weight since being incarcerated and notes that, according to medical records, plaintiff gained five pounds between September 2011 and December 12, 2011.

In one undated document, plaintiff indicates that he did not receive food from "Officer Walter." (Id.) This document lists eight specific days between December 8, 2011 and December 19, 2011. This document also references other complaints, unrelated to meals, that appear to refer to those dates. Plaintiff has not submitted a declaration affirming which days listed in this document concerned missed meals.

On another undated document that was apparently drafted by plaintiff in early January 2012, plaintiff admits that he did not eat the boiled eggs that he received on December 30, 2011, and that, on December 31, 2011, he told the officer on duty that during the past week, he had been sent eggs and that he wanted the "regular tray." (Id.)

On March 1, 2012, plaintiff filed a grievance stating that he was always being fed noodles or boiled eggs and salad, and that he was tired of eating those meals. (Id.)

### b. Standard

"The Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" Robles v. Coughlin, 725 F.2d 12, 15-16 (2d Cir. 1983) (quoting Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980)). In certain circumstances, a substantial deprivation of food, including the denial of a medically proscribed diet, may constitute an Eighth Amendment violation. Id.; Tafari v. Weinstock, No. 07–CV–0693, 2010 WL 3420424, at *7 (W.D.N.Y. Aug. 27, 2010).

When a prisoner alleges that the conditions of his confinement, including his food, violate the Eighth Amendment, the prisoner must prove "both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with . . . 'deliberate indifference to inmate health or safety.'" Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825. 834 (1994) (citations and internal quotation marks omitted)).

Ultimately, to establish the objective element of an Eighth Amendment claim, "a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." Id.

### c. Analysis

Defendants argue that plaintiff received a proper diet as evidenced by plaintiff's grievances, which show that he was receiving boiled eggs, salad, and noodles and the "diet tray" without turkey. Defendants also argue that plaintiff's food preferences do not rise to the level of a constitutional violation and that the prison's response to plaintiff's December 15 grievance

indicates that plaintiff gained weight while incarcerated. According to defendants, at most, plaintiff's allegations constitute a claim for negligent oversight by unidentified individuals.

Plaintiff argues that this case involves more than mere negligent oversight because plaintiff informed at least ten officers of his allergy, wrote numerous letters, made sick calls and contacted Internal Affairs. Accordingly, plaintiff maintains that he adequately informed the prison staff that he was not receiving his medically proscribed diet, and that facility personnel intentionally interfered with his receipt of food. Plaintiff also argues that he requested and should have received a kosher meal because, as a Muslim, he cannot eat anything "that is not prayed." (See Pl. Dep. at 121; Pl.'s Br. at 14 (citing grievance that plaintiff filed while in immigration custody).)

### i. First Amendment Claim Concerning Denial of Kosher Meals

Plaintiff argues that prison officials were required to provide him with a diet that was consistent with his religious scruples, and that they failed to do so here. Defendants do not address this argument. This claim sounds in the First Amendment, not the Eighth Amendment. Plaintiff's complaint, however, does not allege a First Amendment claim. Accordingly, this claim is dismissed. The Court also notes that plaintiff's only written complaint concerning a kosher meal was a grievance that he filed while in immigration custody, not while he was held by Nassau County.

### ii. Eighth Amendment Claim

In light of the written documents discussed at length above, plaintiff's vague and speculative testimony about missing four to five meals per week during an unspecified period of time is insufficient to raise a genuine issue of material fact on his Eighth Amendment diet

claims.[24]  "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."  Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  At best, the documentary evidence authored by plaintiff shows that he missed some meals in December 2011.  Notably, a number of plaintiff's own grievances and documents, including his November 28, 2011 grievance, March 2012 grievance and his notes that discuss boiled eggs, indicate that plaintiff was receiving meals without turkey and make no mention of missed meals.  These documents also show that plaintiff was unhappy with the content of the substitute meals he received when turkey was on the menu.  That is not a violation of the Eighth Amendment.  See Word v. Croce, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001) ("Preference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.").  Plaintiff's vague estimate of missed meals in his deposition testimony is insufficient to raise a factual question for the jury on this claim and falls well short of the cases in which courts have denied summary judgment on Eighth Amendment diet claims.  See, e.g., Abascal v. Fleckenstein, 06-CV-349, 2012 WL 638977, at *3 (W.D.N.Y. Feb. 27, 2012) (inmate was denied seven meals in a four-day period); Beckford v. Portuondo, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) (inmate received only one meal per day for eight days); cf. Phelps, 308 F.3d at 185–86 (reversing dismissal of plaintiff's complaint which alleged that prison officials deprived him of a nutritionally adequate diet for fourteen straight days and that this caused him to lose over thirty pounds).  Beyond plaintiff's vague estimate in his deposition testimony, plaintiff's written documents—specifically, his December 13, 2011 Internal Affairs grievance and his note that references "Officer Walter"—suggest that plaintiff may have missed 8 meals in 18 days.  That is

---

[24]  Notably, plaintiff does not even cite to his testimony about missing four to five meals per week, and never identifies in his brief or 56.1 statement how many meals he missed.  Nor do his papers discuss the content of the substitute meals that he did receive when turkey was on the menu.

insufficient to survive summary judgment.  See contra id.  Moreover, plaintiff's claim is also deficient in another respect.

To establish that denial of a medically proscribed diet violates the Eighth Amendment, plaintiff must establish that "'a sufficiently serious condition' resulted from the food not being received."  Tafari, 2010 WL 3420424, at *7 (quoting LaBounty v. Gomez, 94-CV-3360, 1998 WL 214774, at *1 (S.D.N.Y. May 1, 1998)).  Plaintiff's only evidence on this point is his vague estimate that he lost a lot of weight.  However, although plaintiff claimed that medical records would show his weight loss, no such records are in evidence.  Plaintiff's evidence is insufficient to survive summary judgment on this element of his claim.  Cf. Tafari v. Brown, 10-CV-1065, 2012 WL 1085852, at *19 (N.D.N.Y. Mar. 6, 2012) (report and recommendation) (granting summary judgment where plaintiff's symptoms were allegedly documented by medical staff, but plaintiff failed to introduce those medical records and explaining that "[c]onclusory allegations of constitutional violations alone, without competent medical evidence, are insufficient to establish a significant risk to inmate health necessary to defeat a motion for summary judgment"), adopted in part and rejected in part on other grounds, 2012 WL 1098447 (N.D.N.Y. Mar. 30, 2012).  In fact, the only reference to medical records in the entire record is found in the prison's response to plaintiff's December 15, 2011 grievance–and that response states that plaintiff gained weight during his incarceration.  Specifically, it indicates that he gained five pounds between September 2011 and December 12, 2011.  Moreover, there is no evidence in the record showing that the meals plaintiff missed and the substitute meals the prison provided in

lieu of turkey rendered plaintiff's diet nutritionally inadequate.[25]

Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment meals claim.

### 3. Section 1983 and Section 1985 Conspiracy

Because the Court is granting defendants summary judgment on the Eighth Amendment meals claim, plaintiff's § 1983 and § 1985 conspiracy claims concerning those allegations also fail. Cf. Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001) ("Since plaintiff cannot establish a claim for false arrest or the use of excessive force, he may not maintain a § 1983 cause of action for conspiracy."). Thus, the only remaining question is whether plaintiff has viable conspiracy claims related to the three excessive force incidents.

Plaintiff's brief never even attempts to explain how his conspiracy claims concerning the January 3, 2012 incident involving Daley are viable. (See Pl's Br. at 18.) And, plaintiff's 56.1 statement does not identify any facts suggestive of a conspiracy. Accordingly, the Court grants defendants summary judgment on the conspiracy claims concerning this incident.

With respect to the first excessive force incident involving Hardy, plaintiff points out that, on July 3, 2011, Hardy saw plaintiff's Qur'an, and then called plaintiff a "terrorist," and told him, "You terrorists don't belong in this country." (Pl. Dep. 66.) Later that day, during an encounter with plaintiff, Hardy subjected plaintiff to an arguably gratuitous punch and, while searching and ransacking plaintiff's cell, threw his Qur'an into the toilet. (Id. at 57–60.) Plaintiff argues that Hardy's actions demonstrate discriminatory animus and also suggest a

---

[25] Plaintiff's 56.1 statement asserts that his grievances show that he was never given the opportunity to speak to a nutritionist, who would have been would be the appropriate person to determine whether plaintiff's diet was proper. This point, which plaintiff never attempts to develop in his brief, is insufficient to state an Eighth Amendment claim. Notably, the prison's response to plaintiff's December 15 grievance indicates that plaintiff gained weight while incarcerated, and that he was seen by medical personnel and weighed in September, on November 27, and on December 12. Plaintiff does not dispute these points and his own deposition testimony says nothing about his subsequent medical care, or any lack thereof.

conspiracy under § 1983 and § 1985. Those facts are insufficient to establish a conspiracy. Although at least one other officer was present at the time of Hardy's punch and his search, they had no involvement in the single punch Hardy threw or Hardy's actions involving plaintiff's Qur'an. A reasonable jury could not infer a conspiracy from these facts. Moreover, there is no evidence suggesting that any of these officers were even present when, earlier in the day, Hardy made the "terrorist" comments to plaintiff. Accordingly, no jury could infer that the other officers harbored any discriminatory animus.

Plaintiff has also failed to offer evidence from which a jury could infer an unlawful conspiracy concerning the September 9, 2011 excessive force incident. Shortly before the incident in question, plaintiff had complained to a sergeant that Officer Hardy was not letting plaintiff go to the law library. (Id. at 44.) Plaintiff then went to a prayer service. On plaintiff's way back from the service, Hardy, who was with one or two other officers, stopped him and told him to turn around and face the wall. (Id. at 45.) Hardy then searched plaintiff. (Id.) During the search, Hardy "touched" plaintiff's buttocks, which caused plaintiff to "move[]." (Id.) When plaintiff "moved" during the search, the officers threw him down to floor and punched him. (Id. at 47, 50.) Although one or two other officers also played a role in this, incident, that alone is insufficient evidence from which a jury could infer a conspiracy. The events of this incident appear to have happened quickly, and, to the extent plaintiff's complaint to the sergeant has any relevance, there is no evidence suggesting that the other officers were even aware of that complaint.

For the reasons stated above, the Court grants defendants summary judgment on plaintiff's §1983 and 1985 conspiracy claims.

### 4. Plaintiff's <u>Monell</u> Claims, and Negligent, Hiring, Training, and Supervision Claims against Nassau County

Because plaintiff's excessive force claims survive summary judgment, the Court must address Nassau County's potential liability for those claims under <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658 (1978). Defendants raise the <u>Monell</u> issue in cursory fashion. In their opening brief, defendants assert, in a single sentence, that negligent or even grossly negligent training does not give rise to liability under Section 1983. (Defs.' Br. at 4 (citing <u>City of Canton Ohio v. Harris</u>, 489 U.S. 378, 390 (1989)). Defendants, however, did set out, in their 56.1 statement, facts about the training that each of the individual defendants received. Accordingly, plaintiff was on sufficient notice that defendants were moving on the <u>Monell</u> claims. Hardy and Daley both testified that they received training about the appropriate use of force against inmates. (Defs.' Ex. N at 9–10; Defs.' Ex. O at 8–9.) Plaintiff offers no contrary evidence on the issue of <u>Monell</u>. Accordingly, the Court grants Nassau County summary judgment on plaintiff's <u>Monell</u> claims concerning the three excessive force incidents.

Defendants also argue, in passing, that plaintiff's state law negligent hiring, training, and supervision claim against Nassau County is meritless. (Defs.' Br. at 23.) The training of Hardy and Daley is discussed above, and plaintiff has not put forth any evidence in support of this claim. Accordingly, the Court grants Nassau County summary judgment on plaintiff's state law negligent hiring, training, and supervision claim concerning the excessive force incidents.

### 5. Plaintiff's State Law IIED Claim against the Correction Officer Defendants

Plaintiff's only remaining state law claim is plaintiff's IIED claim, which plaintiff alleged against all of the individual defendants, including the correction officer defendants. Neither party addresses this claim in their summary judgment papers. Although the Court questions the viability of this claim, particularly as against defendant Ford, the Court has no basis to address

this claim at this time.  The Court will discuss this claim at the next status conference with the parties.

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied on plaintiff's excessive force claims concerning the July 3, 2011, September 9, 2011, and January 3, 2012 incidents, and plaintiff's IIED claim against the correction officer defendants.  Defendants' motion for summary judgment is granted with respect to all of plaintiff's other federal claims, plaintiff's state law malicious prosecution claim, and plaintiff's state law negligent hiring, training, and supervision claim concerning the incidents in prison.  The Court will decline to exercise supplemental jurisdiction over plaintiff's state law claims concerning his arrest, prosecution, and conviction.

Dated:  March 31, 2016
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT